UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) NO. |
| NATIONAL RAILROAD PASSENGER CORPORATION, | ) |
| | ) **01** cv **11121** RWZ |
| | ) |
| Defendant. | ) |

## COMPLAINT

The United States of America, by the authority of the Attorney General of the

United States and through its undersigned attorneys, acting at the request of the United

States Environmental Protection Agency ("EPA"), files this complaint and alleges as

follows:

### NATURE OF ACTION

1.      This is a civil action brought pursuant to Sections 309(a) and (d) and 311

(b)(7)(C) of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319(b) and (d) and

1321(b)(7)(C), against the defendant, National Railroad Passenger Corporation

("Amtrak"), for violations of the CWA at nine Amtrak facilities located in Massachusetts,

Rhode Island, and Connecticut.  The complaint alleges violations of  Sections 301, 307,

308, and 311 of the Clean Water Act, 33 U.S.C. §§ 1311, 1317, 1318, and 1321.



RECEIPT # _____ N/A
AMOUNT $ _____ N/A
SUMMONS ISS. _____ N
LOCAL RULE 4.1 _____
WAIVER OF SERV. _____
MCF ISSUED _____
AO 120 OR 121 _____ L
ES
6/28/01

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,

1345, and 1355, and Sections 309(b), 311(b)(7)(E), 311(e)(2), and 311(n) of the CWA, 33

U.S.C. §§ 1319(b), 1321(b)(7)(E), 1321(e)(2), and 1321(n).  Notice of commencement of

this action has been given to the Commonwealth of Massachusetts.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 1395, and

Sections 309(b) and 311(b)(7)(E) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E),

because it is a judicial district in which Amtrak conducts business and where many of the

violations occurred.

## DEFENDANT

4.     Amtrak is a corporation organized and existing under the laws of the

District of Columbia and under 49 U.S.C. Chapters 241, 243, 245, 247 and 249.  It owns

and operates a national passenger rail system and operates commuter rail systems.

Included in Amtrak's operations during the period covered by this complaint are and were

the following facilities:

1.     Boston Engine Terminal, Roland Street (now Commuter Rail Maintenance

       Facility, 70 Rear Third Avenue), Somerville, Massachusetts;

2.     Commuter Rail Service and Inspection Facility, 110 Widett Circle, Boston,

       Massachusetts;

2

3.    Southampton Street Maintenance Facility, 2 Frontage Road , Boston, Massachusetts;

4.    New Haven Motor Storage Facility, 54 Hallock Avenue, New Haven, Connecticut;

5.    Bradford Layover Facility, Railroad Avenue, Bradford, Massachusetts;

6.    Ipswich Layover Facility, Hayward Street, Ipswich, Massachusetts;

7.    Needham Layover Facility, West Street, Needham, Massachusetts;

8.    Providence Maintenance of Way Facility, 309 Royal Little Drive, Providence, Rhode Island; and

9.    North Station, Causeway Street, Boston, Massachusetts.

5.    Amtrak is a person within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

## Count 1: National Pollutant Discharge Elimination System ("NPDES") Permit Violations

6.    The United States realleges and incorporates by reference the allegations of paragraphs 1 through 5 above.

7.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants into navigable waters of the United States except in compliance with the terms and conditions of a National Pollution Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

8.     Section 402 of the CWA, 33 U.S.C. § 1342, provides that the Administrator of EPA may issue permits under the NPDES program for the discharge of any pollutant into the navigable waters of the United States upon such specific terms and conditions as the Administrator may prescribe.

9.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, on June 24, 1994, EPA transferred to Amtrak NPDES Permit No. MA0003590 for discharges from the Boston Engine Terminal facility ("BET") to the Millers River.

10.     The BET Permit required that samples taken in compliance with the monitoring requirements specified in Part I.A. of the permit be taken at outfall number 001 at the oil trap outlet.

11.     From July 1994, through at least March 1996, Amtrak violated its NPDES permit at the Boston Engine Terminal facility by taking samples in the Millers River in the vicinity of the outfall discharge pipe and, thereby, failing to monitor the discharge from this facility at the location specified in the NPDES Permit.

12.     The BET permit imposed a Daily Maximum Discharge Limitation of 15 milligrams per liter of Oil & Grease at outfall number 001.

13.     Amtrak violated its permitted daily maximum effluent limit for oil & grease on May 9, 1996, August 13, 1996 and March 1997 and, therefore, violated its NPDES permit.

4

14.     The BET Permit required Amtrak to monitor its effluent for Oil & Grease at least one day per month and to report the previous three months of monitoring no later that the 28th day of the month following the completed reporting period.

15.     Amtrak violated its NPDES permit by failing to either sample its effluent for Oil & Grease or submit the results to EPA for the months of November and December 1997 and January 1998.

16.     The BET Permit required Amtrak to monitor its effluent for pH at least one day per month and to report the previous three months of monitoring no later that the 28th day of the month following the completed reporting period.

17.     Amtrak violated its NPDES permit by failing to either sample its effluent for pH or submit the results to EPA for January through August 1995, October 1995 through July 1996, November and December 1997, and January 1998.

18.     The BET Permit required Amtrak to monitor its effluent for temperature at least one day per month and to report the previous three months of monitoring no later than the 28th day of the month following the completed reporting period.

19.     Amtrak violated its NPDES permit by failing to either sample its effluent for Temperature or submit the results to EPA for July 1994 through July 1996, November and December 1997, and January 1998.

20.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, on June 24, 1994, EPA transferred to Amtrak NPDES Permit No. MA0028941 for storm water discharges from the North Station facility.

21.     The North Station Permit requires that samples taken in compliance with the monitoring requirements specified in Part I.A. of the permit be taken at outfall number 001 at a representative point prior to discharge into the Charles River.

22.     Amtrak failed to monitor its discharge in accordance with the requirements of its NPDES Permit from July 1, 1994, to October 1, 1997, by taking the samples for outfall 001 of the North Station facility in the Charles River.

23.     The North Station permit requires Amtrak to monitor its discharge from outfall 001 monthly for Oil and Grease with a grab sample taken within one hour after the start of a storm event and to report the monitoring results for each month by the fifteenth day of the month following the completed reporting period.

24.     Amtrak violated its NPDES permit by failing to either sample its effluent for Oil & Grease, or submit the results to EPA for November and December 1997 and January and March 1998.

25.     The North Station Permit requires Amtrak to monitor its effluent for pH with a grab sample at least one day per month and to report the monitoring results for each month by the fifteenth day of the month following the completed reporting period.

6

26.    Amtrak violated its NPDES permit by failing to either sample its effluent for pH or submit the results to EPA for January through August 1995, October 1995 through July 1996, November and December 1997, and January and March 1998.

27.    Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Amtrak is liable for a civil penalty of up to $25,000 per day for each violation occurring prior to January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997, or thereafter.

## Count 2: Failure to Apply for Storm Water Permits

28.    The United States realleges and incorporates by reference the allegations of paragraphs 1 through 27 above.

29.    Section 308(a) of the CWA, 33 U.S.C. § 1318(a) authorizes the Administrator of EPA to require the owner or operator of any point source to provide such information as the Administrator may reasonably need to carry out the objectives of the CWA, including, among other things, the development and issuance of NPDES permits under Section 402 of the CWA, 33 U.S.C. § 1342.

30.    Under Sections 308 and 402 of the CWA, 33 U.S.C. §§ 1318 and 1342, the Administrator promulgated regulations relating to the control of storm water discharges, at 40 C.F.R. § 122.26.

7

31.     Section 122.26(c)(1), 40 C.F.R., provides that dischargers of storm water associated with industrial activity are required to apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.  The deadline for permit applications was October 1, 1992.  See 40 C.F.R. § 122.26(e); 57 Fed. Reg. 44438 (September 25, 1992) (general permit).

32.     Under 40 C.F.R. § 122.26(b)(14)(viii), storm water associated with industrial activity includes storm water from transportation facilities identified as Standard Industrial Classification (SIC) code 40 and 41 facilities which have vehicle maintenance shops or equipment cleaning operations.

33.     During all relevant time periods, Amtrak owned and/or operated the following SIC code 40 or 41 transportation facilities at which it performed vehicle maintenance and equipment cleaning operations within the meaning of 40 C.F.R. § 122.26(b)(14)(viii): Commuter Rail Service and Inspection Facility; Southampton Street Maintenance Facility; Bradford Layover Facility; Ipswich Layover Facility; Needham Layover Facility; and Providence Maintenance of Way Facility.

34.     Since at least October 1, 1992, Amtrak has discharged "storm water associated with industrial activity" within the meaning of 40 C.F.R. § 122.26 from the Commuter Rail Service and Inspection Facility to the Fort Point Channel.  Storm water from the Commuter Rail Service and Inspection Facility discharges through storm drains,

catch basins, and drainage pipes to the Dorchester Brook Culvert and ultimately to the Fort Point Channel.

35.     The storm drains, catch basins, and drainage are all "point sources" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

36.     The Fort Point Channel is part of Boston Harbor, which is a "water of the United States" within the meaning of Section 502 of the CWA, 33 U.S.C. § 1362.

37.     Amtrak did not apply for a permit for discharges of storm water from Commuter Rail Service and Inspection Facility until June 2, 1997, and did not receive permit coverage until June 4, 1997.

38.     Since at least October 1, 1992, Amtrak has discharged "storm water associated with industrial activity" within the meaning of 40 C.F.R. § 122.26 from the Southampton Street Maintenance Facility via catch basins to the facility storm sewer system, which discharges to culverts that lead to the Dorchester Brook Culvert. This culvert ultimately conveys storm water to Fort Point Channel, a "water of the United States" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

39.     The catch basins and storm sewer system are "point sources" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

40.     Amtrak failed to apply for a permit for storm water discharges from the Southampton Street Maintenance Facility to Fort Point Channel until June 2, 1997, and did not receive permit coverage until June 4, 1997.

41.     Since at least October 1, 1992, Amtrak has discharged "storm water associated with industrial activity" within the meaning of 40 C.F.R. § 122.26 from the Bradford Layover Facility to catch basins which discharge to a tributary of the Merrimack River.

42.     The catch basins are "point sources" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

43.     The Merrimac River and its tributary are "waters of the United States" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

44.     Amtrak failed to apply for a permit for storm water discharges from the Bradford Layover Facility to the tributary to the Merrimac River until January 30, 2001, and did not obtain permit coverage until April 8, 2001.

45.     Since at least October 1, 1992, until April 2, 1995, and from October 27, 1995, until January 12, 1999, Amtrak discharged "storm water associated with industrial activity" within the meaning of 40 C.F.R. § 122.26 from the Ipswich Layover Facility to a catch basin on an adjacent property which discharges to the Ipswich River.

46.     The catch basin is a "point source" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

10

47.   The Ipswich River is a "water of the United States" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

48.   Amtrak failed to apply for permit coverage for storm water discharges from the Ipswich Layover Facility to the Ipswich River.

49.   Since at least October 1, 1992, until April 2, 1995, and from May 16, 1997, to the present, Amtrak has discharged "storm water associated with industrial activity" within the meaning of 40 C.F.R. § 122.26 from the Needham Layover Facility drains through catch basins to a tributary of the Charles River.

50.   The catch basins are "point sources" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

51.   The Charles River and its tributaries are "waters of the United States" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

52.   Amtrak failed to apply for a permit for storm water discharges from the Needham Layover Facility to the tributary of the Charles River until January 30, 2001, and did not obtain permit coverage until April 8, 2001.

53.   By failing to apply for a permit at the Commuter Rail Service and Inspection Facility, the Southampton Street Maintenance Facility, the Bradford Layover Facility, the Ipswich Layover Facility, and the Needham Layover Facility, by October 1, 1992, Amtrak violated Section 308(a) of the CWA, 33 U.S.C. § 1318(a).

54.   Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b)

11

and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Amtrak is

liable for a civil penalty of up to $25,000 per day for each violation occurring prior to

January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997,

or thereafter.

## Count 3: Unauthorized Discharge of Storm Water

55.    The United States incorporates by reference the allegations in paragraphs 1

through 54 above as though fully set forth herein.

56.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a),  prohibits the discharge of

pollutants by any person into the navigable waters of the United States except in

compliance with, among other things, a NPDES permit issued under Section 402 of the

CWA, 33 U.S.C. § 1342.

57.    Between October 1, 1992, and June 4, 1997, Amtrak periodically

discharged "storm water associated with industrial activity" into waters of the United

States from the Commuter Rail Service and Inspection Facility and the Southampton

Street Maintenance Facility without a permit.

58.    Between October 1, 1992, and April 8, 2001, Amtrak periodically

discharged storm water associated with industrial activity into waters of the United States

without a permit from the Bradford Layover Facility.

59.    Between October 1, 1992, and April 2, 1995, and between October 27,

1995, and January 12, 1999, Amtrak periodically discharged storm water associated with

12

industrial activity into waters of the United States without a permit from the Ipswich Layover Facility.

60.     Between October 1, 1992, and April 2, 1995, and between May 16, 1997, and April 8, 2001, Amtrak periodically discharged storm water associated with industrial activity into waters of the United States without a permit from the Needham Layover Facility.

61.     Pursuant to Section 402(b) of the CWA, the State of Rhode Island was authorized to administer the NPDES permit program.  Rhode Island is authorized to issue individual or general permits under the Rhode Island Pollutant Discharge Elimination System (RIPDES).

62.     The authority for the issuance of permits in Rhode Island is established at Title 46, Chapter 12 of the Rhode Island General Laws.  RIPDES Rule 31(a)(1) and (b)(15)  requires that facilities that have storm water discharges associated with industrial activity seek permit coverage.

63.     On February 9, 1993, the Rhode Island Department of Environmental Management (RIDEM) issued a state wide General Permit for Storm Water Associated with Industrial Activities.

64.     Under this permit, Amtrak was required to apply for storm water permit coverage for the Providence Maintenance of Way Facility by April 19, 1993, and to develop a SWPPP by April 1, 1993.

65.     Since at least April 1, 1993, Amtrak has periodically discharged "storm water associated with industrial activity" within the meaning of RIPDES Rule 31(b)(15) and 40 C.F.R. § 122.26 from the Providence Maintenance of Way Facility through catch basins and a storm water drainage system into the West River.

66.     The catch basins and storm water drainage system are "point sources" within the meaning of Section 502(14) of the Clean Water Act, 33 U.S.C. § 1362(14).

67.     The West River is a "water of the United States" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

68.     Amtrak failed to apply for a permit for storm water discharges from the Providence Maintenance of Way Facility to the West River until July 23, 1998.

69.     Since at least April 19, 1993, to July 23, 1998, Amtrak periodically discharged storm water associated with industrial activity into waters of the United States from the Providence Maintenance of Way Facility without a permit.

70.     Amtrak's discharge of storm water associated with industrial activity from Commuter Rail Service and Inspection Facility, Southampton Street Maintenance Facility, Bradford Layover Facility, Ipswich Layover Facility, Needham Layover Facility, Providence Maintenance of Way Facility are discharges of pollutants within the meaning of Section 502(12) of the Clean Water Act, 33 U.S.C. § 1362(12).

71.     By discharging storm water associated with industrial activity from the Commuter Rail Service and Inspection Facility, the Southampton Street Maintenance

Facility, the Bradford Layover Facility, the Ipswich Layover Facility, the Needham

Layover Facility, and the Providence Maintenance of Way Facility without a permit,

Amtrak violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

72.    Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and

(d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Amtrak is

liable for civil penalty of up to $25,000 per day for each violation occurring  prior to

January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997,

or thereafter.

### Count 4:  Discharging Storm Water In Violation of its NPDES Permit

73.    The United States realleges and incorporates by reference the allegations of

paragraphs 1 through 72 above.

74.    On June 4, 1997, Amtrak received coverage under NPDES General

Stormwater Discharge Permit, No. MAR05A848 for storm water discharges from the

Commuter Rail Service and Inspection Facility to the Dorchester Brook Culvert and

ultimately to the Fort Point Channel.  The permit required that Amtrak prepare and

implement a storm water pollution prevention plan for the facility.  Amtrak failed to

develop and implement a storm water pollution prevention plan as required by the permit

until July 13, 1998.

75.     From June 4, 1997, through July 13, 1998, Amtrak periodically discharged storm water associated with industrial activity in violation of the Commuter Rail Service and Inspection Facility permit.

76.     On June 4, 1997, Amtrak received coverage under NPDES General Stormwater Discharge Permit, No. MAR05A847 for storm water discharges from the Southampton Street Maintenance Facility to the Dorchester Brook Culvert and ultimately to the Fort Point Channel.  The permit required that Amtrak prepare and implement a storm water pollution prevention plan for the facility.  Amtrak failed to develop and implement a storm water pollution prevention plan as required by the permit until July 9, 1998.

77.     From June 4, 1997, through July 9, 1998, Amtrak periodically discharged storm water associated with industrial activity in violation of the Southampton Street Maintenance Facility permit.

78.     By discharging storm water from the Commuter Rail Service and Inspection Facility and the Southampton Street Maintenance Facility without having developed storm water pollution prevention plans, Amtrak violated its permits and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

79.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Amtrak is liable for a civil penalty of up to $25,000 per day for each violation occurring  prior to

January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997,

or thereafter.

## Count 5: SPCC Plan Violations

80.    The United States incorporates by reference the allegations in paragraphs 1

through 79 as though fully set forth herein.

81.    Pursuant to Section 311(j)(1) of the CWA, 33 U.S.C. § 1321(j)(1), EPA has

promulgated Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.

82.    Pursuant to 40 C.F.R. § 112.3(a), the owner or operator of an onshore

facility in operation on or before January 10, 1974 (the effective date of the Oil Pollution

Prevention Regulations) that has discharged or, due to its location, could reasonably be

expected to discharge, oil in harmful quantities into or upon the navigable waters of the

United States was required to prepare a Spill Prevention Control and Countermeasure

("SPCC") Plan by no later than July 10, 1974.  Pursuant to 40 C.F.R. § 112.3(b), owners

or operators of facilities that become operational after that date are required to prepare a

SPCC Plan within six months after the date the facility begins operations.

83.    The Oil Spill Pollution Regulations require owners or operators of facilities

subject to § 112.3(a) or (b) to amend the SPCC plan whenever there is a change in facility

design, construction, operation, or maintenance which materially affects the facility's

potential for the discharge of oil into navigable waters.  40 C.F.R. § 112.5(a).  For

17

facilities that became operational after January 10, 1974, the SPCC plan must be prepared within six months after the date such facility begins operations.

84.     The Oil Pollution Prevention Regulations also require owners and operators of facilities subject to 40 C.F.R. § 112.3(a) or (b) to complete a review and evaluation of the SPCC plan at least once every three years from the date such facility becomes subject to the provision.  40 C.F.R. § 112.5(b).

85.     Amtrak is the "owner" and/or "operator" within the meaning of Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6), and 40 C.F.R. Part 112, of the Commuter Rail Service and Inspection Facility; the Southampton Street Maintenance Facility; the Providence Maintenance of Way Facility; and the New Haven Motor Storage Facility.

86.     Each of the facilities identified in paragraph 85 is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. § 1321(a)(10) and 40 C.F.R. Part 112.

87.     At all relevant times, Amtrak has stored "oil" within the meaning of 40 C.F.R. § 112.2 at each of the facilities.

88.     Due to their respective locations, each facility identified in paragraph 85 could reasonably be expected to discharge oil in harmful quantities into or upon surface waters which are "navigable waters of the United States" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and 40 C.F.R. §§ 110.1 and 112.2(k).

89.   Since at least September 1982, the Providence Maintenance of Way Facility has had an oil storage capacity subjecting it to the requirements of the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.  Amtrak failed to prepare a SPCC plan until September 24, 1998.

90.   By failing to prepare a SPCC plan within six months of commencing operations at the Providence Maintenance of Way Facility, Amtrak violated 40 C.F.R § 112.3(b) and Section 311(j)(1) of the CWA, 33 U.S.C. § 1321(j)(1).

91.   Since at least September 1991, the Commuter Rail Service and Inspection Facility has had an oil storage capacity subjecting it to the requirements of the Oil Pollution Prevention Regulations.  See 40 C.F.R. Part 112.

92.   The SPCC plan for the Commuter Rail Service and Inspection Facility was dated October 2, 1992.

93.   Amtrak failed to review and evaluate its SPCC plan for the Commuter Rail Service and Inspection Facility by October 2, 1995 and did not review its SPCC plan until March 31, 1997.

94.   The SPCC plan for the Commuter Rail Service and Inspection Facility should have been amended no later than six months following the required plan review because it lacked critical information.

95.   Amtrak failed to amend its SPCC plan for the Commuter Rail Service and Inspection Facility from February 1995 until January 14, 1998.

19

96.     By failing to review and evaluate the Commuter Rail Service and Inspection Facility's SPCC plan every three years and failing to amend its SPCC plan when there was a change in facility design, construction, operation, or maintenance which materially affected the facility's potential for the discharge of oil into navigable waters, Amtrak violated 40 C.F.R § 112.3(b) and Section 311(j)(1) of the CWA, 33 U.S.C. § 1321(j)(1).

97.     Since at least the late 1980s, the Southampton Street Maintenance Facility has had an oil storage capacity, subjecting it to the requirements of the Oil Pollution Prevention Regulations. See 40 C.F.R. Part 112.

98.     The SPCC plan for the Southampton Street Maintenance Facility was dated October 2, 1992.

99.     Amtrak failed to review and evaluate its SPCC plan for the Southampton Street Maintenance Facility by October 2, 1995, and did not review its SPCC plan until December, 1997.

100.    As of March 26, 1997, the number of drums of oil on site at the Southampton Street Maintenance Facility substantially exceeded the number of drums identified in the October 2, 1992, SPCC plan.

101.    Amtrak failed to amend its SPCC plan for the Southampton Street Maintenance Facility from March 26, 1997, until December 22, 1997.

102.    By failing to review and evaluate the Southampton Street Maintenance Facility's SPCC plan every three years and failing to amend its SPCC plan when there

was a change in the facility which materially affected the facility's potential for the discharge of oil into navigable waters, Amtrak violated 40 C.F.R § 112.3(b) and Section 311(j)(1) of the CWA, 33 U.S.C. § 1321(j)(1).

103.   Since at least 1979, the New Haven Motor Storage Facility has had an oil storage capacity, subjecting it to the requirements of the Oil Pollution Prevention Regulations. See 40 C.F.R. Part 112.

104.   Amtrak failed to review and evaluate its SPCC plan for the New Haven Motor Storage Facility from 1984 until January 1998.

105.   Amtrak failed to amend its SPCC plan for the New Haven Motor Storage Facility from 1984 until January 15, 1998.

106.   By failing to review and evaluate the New Haven Motor Storage Facility's SPCC plan every three years and failing to amend its SPCC plan, Amtrak violated 40 C.F.R § 112.3(b) and Section 311(j)(1) of the CWA, 33 U.S.C. § 1321(j)(1).

107.   Pursuant to Sections Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Amtrak is liable for civil penalty of up to $25,000 per day for each violation occurring prior to January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997, or thereafter.

## **Count 6: Oil Spill**

108.    The United States incorporates by reference the allegations in paragraphs 1 through 107 as though fully set forth herein.

109.    Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), prohibits the discharge of oil in harmful quantities into or upon the navigable waters of the United States or adjoining shorelines.

110.    "Discharge" under Section 311(a)(2) of CWA, 33 U.S.C. § 1321(a)(2), includes, but is not limited to, the spilling, leaking, pumping, pouring, emitting, emptying, or dumping of oil.

111.    Pursuant to Section 311(b)(3) and (b)(4) of the CWA, 33 U.S.C. § 1321(b)(3) and (b)(4), EPA has defined a "harmful quantity" of oil to include any discharge of oil that causes a film or sheen upon or discoloration of the surface of the water or adjoining shorelines.    40 C.F.R. § 110.3.

112.    On April 6, 1998, Amtrak discharged oil in harmful quantities from the Southampton Street Maintenance Facility through the Dorchester Brook Culvert to the Fort Point Channel.

113.    The discharge of oil from the facility caused a sheen upon or discoloration of the surface of the waterway.

114.    This discharge of oil in harmful quantities into the navigable waters of the
United States constitutes a violation of Section 311(b)(3) of the CWA, 33 U.S.C.
§ 1321(b)(3).

115.    Pursuant to Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A),
and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Amtrak is liable for
civil penalty of up to $27,500 or an amount up to $1100 per barrel of oil discharged.

### Count 7: Violation of Pretreatment Program Requirements

116.    The United States incorporates by reference the allegations in paragraphs 1
through 115 as though fully set forth herein.

117.    Section 307(b) and (c) of the CWA, 33 U.S.C. § 1317(b) and (c), requires
the Administrator of the EPA to establish pretreatment standards for existing and new
discharges to Publicly Owned Treatment Works ("POTWs").  These standards are
established to prevent the discharge into a POTW of any pollutant which may interfere
with, pass through, or otherwise be incompatible with a POTW.

118.    Section 402(a)(3) and (b)(8) of the CWA, 33 U.S.C. § 1342(a)(3) and
(b)(8), requires that NPDES permits issued to POTWs receiving pollutants from
significant sources subject to 307(b) standards require that the POTW establish a
pretreatment program to ensure compliance with these standards.

119.    Pursuant to Section 402(a)(3) and (b)(8) of the CWA, 33 U.S.C.

§ 1342(a)(3) and (b)(8), EPA and the Rhode Island Department of Environmental Management ("RIDEM") issued permits to the Narragansett Bay Commission ("NBC") requiring the development and implementation of a pretreatment program.

120.   The NBC pretreatment program, developed in accordance with its permit condition, was approved by EPA on September 13, 1984.

121.   In September 1984, EPA authorized the RIDEM to implement the NPDES and pretreatment programs in Rhode Island.

122.   The NBC's pretreatment program has been implemented in accordance with the NBC's permit requirements issued by the RIDEM pursuant to Section 402(b)(8) of the CWA, 33 U.S.C. § 1342(b)(8).

123.   To implement its pretreatment program, the NBC adopted Rules and Regulations for the use of Wastewater Facilities within the Narragansett Bay Water Quality Management District Commission ("NBC Rules").

124.   Violations of the NBC Rules constitute violations of requirements imposed in a pretreatment program approved under Section 402(a)(3) and (b)(8) of the CWA, 33 U.S.C. § 1342(a)(3) and (b)(8).

125.   Section 403.5(c)(1), 40 C.F.R., promulgated pursuant to Section 307(b) and (c) of the CWA, 33 U.S.C. § 1317(b) and (c),  provides that each POTW developing a pretreatment program pursuant to 40 C.F.R. § 403.8 must develop and enforce local limitations designed to achieve the goals of Section 307 of the CWA, 33 U.S.C. § 1317.

126.   Pursuant to 40 C.F.R. § 403.5(d), local limitations are deemed pretreatment standards for purposes of Section 307(d) of the CWA.

127.   Section 307(d) of the CWA, 33 U.S.C. § 1317(d), provides that, after the effective date of any pretreatment standard, it shall be unlawful for any owner or operator of any source to operate that source in violation of any such pretreatment standard.

128.   Section 309(b) and (d) of the CWA, 33 U.S.C. § 1319(b) and (d), authorizes the Administrator to initiate an enforcement action against any person who violates Section 307 or any requirement imposed in a pretreatment program approved under Section 1342(a)(3) or 1342(b)(8) of the CWA.

129.   In accordance with Article 8.1 of the NBC Rules, all users connected to the NBC's wastewater treatment facilities must obtain a waste water discharge permit prior to discharging process wastewater into the sewer system.

130.   Amtrak failed to obtain a waste water discharge permit before discharging waste water approximately several times per week on a seasonal basis from the Providence Maintenance of Way steam cleaning operation to the NBC.

131.   By failing to obtain a discharge permit prior to discharging to the NBC, Amtrak violated the NBC Rules and, thereby, violated a requirement imposed in NBC's pretreatment program, enforceable under Section 309(b) and (d) of the Act, 33 U.S.C. § 1319(b) and (d).

132. The violations of the NBC Rules continued approximately several times per week on a seasonal basis from September 13, 1984, until September 24, 1998, when Amtrak ceased discharging to the NBC.

133. Article 5.5 of the NBC Rules prohibits the discharge of storm water to the NBC facilities unless approved by the NBC.

134. The Specific Discharge Prohibitions of the NBC Rules are local limits developed in accordance with 40 C.F.R. § 403.5(c) and are, therefore, pursuant to 40 C.F.R. § 403.5(d), pretreatment standards for the purposes of Section 307(d) of the Act, 33 U.S.C. § 1317(d).

135. Amtrak discharged storm water from the Providence Maintenance of Way to the NBC facilities without approval of the NBC, in violation of Article 5.5 of the NBC Rules.

136. This violation constitutes a violation of Section 307(d) of the Act, 33 U.S.C. § 1317(d) and a violation of a requirement imposed in NBC's pretreatment program and is, therefore, enforceable under Section 309(b) and (d), of the Act, 33 U.S.C. § 1319(b) and (d).

137. Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, Amtrak is liable for a civil penalty of up to $25,000 per day for each violation occurring prior to

January 30, 1997, and $27,500 per day for each violation occurring on January 30, 1997, or thereafter.

### **Count 8: Unauthorized Discharge of Process Water**

138.   The United States incorporates by reference the allegations in paragraphs 1 through 137 as though fully set forth herein.

139.   Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants into navigable waters of the United States except in compliance with the terms and conditions of a National Pollution Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

140.   Amtrak owns and operates the New Haven Motor Storage Facility in New Haven, Connecticut.

141.   On June 15, 1996, Amtrak discharged wash-down water from the fueling platform at the New Haven Motor Storage Facility.

142.   The wash-down water from these practices flowed via a storm drain to the Long Island Sound.

143.   Amtrak did not have a permit authorizing these discharges.

144.   The Long Island Sound is a navigable water of the United States within the meaning of Section 503(7), 33 U.S.C. § 1362(7).

27

145.   The wash-down water Amtrak discharged from the New Haven Motor Storage Facility contained "pollutants" within the meaning of Section 502(6), 33 U.S.C. § 1362(6).

146.   By discharging wash waters from the New Haven Motor Storage Facility to the Long Island Sound without a permit, Amtrak violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

147.   Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), Amtrak is liable for a civil penalty of up to $25,000 for this violation.

## RELIEF SOUGHT

Wherefore, Plaintiff, the United States of America, respectfully requests that the Court grant the following relief:

1.   Permanently enjoin Amtrak from discharging waste water or storm water from point sources not authorized by a NPDES permit or in violation of the terms of any NPDES permit;

2.   Permanently enjoin Amtrak from discharging waste water or storm water in violation of a requirement imposed in the NBC's pretreatment program;

3.   Permanently enjoin Amtrak from storing oil at facilities that could reasonably be expected to discharge oil in harmful quantities into or upon surface waters except in compliance with the Oil Pollution Prevention Regulations at 40 C.F.R. Part 112.

4.    Order Amtrak to pay a civil penalty not to exceed twenty-five thousand

dollars ($25,000) for each day of each violation of the Clean Water Act occurring prior to

January 31, 1997, and a civil penalty not to exceed twenty-seven thousand five hundred

dollars ($27,500) for each day of each violation of the Clean Water Act occurring on or

after January 31, 1997;

5.    Award the United States all costs and disbursements of this action; and

6.    Grant such other relief as the Court deems just and proper.

Respectfully submitted,

JOHN C. CRUDEN
Acting Assistant Attorney General
Environment and Natural Resources
Division

Henry Friedman
U.S. Department of Justice
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Sta.
Washington, DC 20044
(202) 514-5268

JAMES B. FARMER
United States Attorney

By:    George B. Henderson, II
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
Suite 9200, 1 Courthouse Way
Boston, MA 02210
(617) 748-3282

OF COUNSEL:
EDITH GOLDMAN
Senior Assistant Regional Counsel
United States Environmental Protection
  Agency, Region I
One Congress Street, Suite 1100 – Mail Code SEL
Boston, Massachusetts 02114-2023

Dated:   June 28, 2001

30